UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
TYRELL JOHNSON,

        Petitioner,

    -against-

DENNIS BRESLIN and ANDREW CUOMO,

        Respondents.
-----------------------------------------------------------x

**OPINION AND ORDER**
06-CV-5052 (DLI)

**DORA L. IRIZARRY, U.S. District Judge:**

    Petitioner Tyrell Johnson is currently serving two concurrent sentences of ten years of imprisonment following his conviction in New York State Supreme Court, Kings County, for attempted murder in the second degree, New York Penal Law § 110/125.25[1], and criminal possession of a weapon in the second degree, New York Penal Law § 265.03. Pursuant to 28 U.S.C. § 2254, petitioner challenges his conviction, contending that: (1) his verdict was against the weight of the evidence; (2) he received ineffective assistance of counsel; and (3) the trial court violated his due process rights by admitting evidence of uncharged crimes. For the reasons set forth below, the petition is denied.

I.    Background

    a.  Facts Adduced at Trial

    On December 2, 2000, North Carolina police arrested petitioner and his accomplice, Michael Scott, for possessing crack cocaine. (Trial Tr. ("Tr.") at 28:23 -

1

29:4.) Scott was a schizophrenic drug addict who allowed petitioner to prepare crack cocaine at his home in return for narcotics. (Tr. at 29:1-11.) Both were released on bail. (Tr. at 29:20-24.) While out on bail, petitioner visited Scott and attempted to persuade him to claim ownership of the drugs and "take the rap" for the crime. (Tr. at 30:3-11.) Petitioner told Scott that the police would not charge him for the crime because of his schizophrenia. (Tr. at 30:7-11.) When Scott refused, petitioner instructed him to get into petitioner's car and told him that they were going to South Carolina to see a "witch doctor or root doctor." (Tr. at 30:17 - 31:6.) A root doctor is a "voodoo-type person" whom some believe can help with their problems. (Tr. at 209:6-8.)

Instead of driving to South Carolina, petitioner, along with his friend, Tearence Moody, drove Scott to New York on December 15, 2000. (Tr. at 209:15-16.) While Moody and petitioner took turns driving, Scott was in the backseat, using drugs and sleeping. (Tr. at 31:3-4.) At trial, the parties offered differing accounts of where those drugs came from. Testifying for the prosecution, Scott explained that petitioner gave him the drugs during the trip. (Tr. at 31:23 - 32:6, 60:4-6.) Moody, who testified for petitioner, claimed that he never saw petitioner give drugs to Scott and that Scott "had his own [drugs]" in the car. (Tr. at 212:15-19, 226:9-14.)

Petitioner, Scott, and Moody arrived in New York City on the morning of December 16, 2000. (Tr. at 32:23 - 33:2, 208:21-22.) They drove around the city in search of a root doctor but were unsuccessful. (Tr. at 211:10-18.) Petitioner then left Moody and Scott at a friend's house in Brooklyn while he continued the search. (Tr. at 34:22-25, 211:19 - 212:23, 231:19-21.) He did not return to the house until sometime

2

between 4:30 P.M. and 5:00 P.M. that day. (Tr. at 34:22-25.)

Scott testified that petitioner gave him drugs when he returned, and then petitioner, Moody, and Scott left together in the car. (Tr. at 35:5-13.) After a short drive, petitioner made an unexpected stop near "[a]n overhead train" and asked Scott to empty his pockets. (*Id.*) Petitioner gave Scott something wrapped in a napkin and asked him to put it in his pocket. (Tr. at 35:15-25.) The napkin contained crack cocaine, but Scott claims that, when he took the napkin, he was unaware of the narcotics. (35:20, 38:17 - 39:1.) According to Scott, immediately after he put the napkin in his pocket, petitioner led him to a secluded area on foot, shot him, and then fled. (Tr. at 35:17 - 36:20.)

Petitioner denies shooting Scott. At trial, Moody testified that, after petitioner picked up Scott and Moody from the house in Brooklyn, they dropped Scott off so that he could find some drugs. (Tr. at 213:7-17.) Petitioner and Moody planned on picking Scott up after getting something to eat. (Tr. at 214:4-7.) After the meal, petitioner and Moody searched for Scott for about 45 minutes but were unable find him. (Tr. at 214:24 - 215:17.)

Police Officer Peter Hart of the New York City Police Department testified that, on December 16, 2000, he encountered Scott while patrolling Van Sinderen Avenue near the L train in his cruiser. (Tr. at 122:23 - 123:5.) Scott flagged him down and asked for help, claiming that he had been shot. (Tr. at 37:2.) Hart testified that, when he encountered Scott, Scott was not exhibiting the signs of an "emotionally disturbed person." (Tr. at 125:17-19.) When he asked Scott who shot him, Scott said that he did

3

not know. (Tr. at 126:8-12.) Hart then called for an ambulance, which took Scott to the hospital. (Tr. at 124:13-16.) While there, Scott told hospital personnel and the police that petitioner had shot him and that petitioner had given him something to put in his pocket. (Tr. at 38:15-22, 71:13-20.) The police found a napkin full of cocaine in the pocket of his pants and arrested him for possession of cocaine. (Tr. at 38:24 - 39:5.)

At trial, petitioner questioned the reliability of Scott's account of the shooting given his history of schizophrenia and drug use. In response, the prosecution called Dr. Robert Goldstein, a schizophrenia expert who had reviewed Scott's psychiatric records and outpatient clinical records, as well as the ambulance report and hospital records from the day of the shooting. (Tr. at 182:23 - 183:12.) Additionally, Dr. Goldstein had personally examined Scott. (Tr. at 188:25 - 189:8.)

Dr. Goldstein testified that, in the months prior to the shooting, Scott had been taking Haldol, an anti-psychotic medication that had kept Scott's schizophrenia in remission. (Tr. at 185:11 - 186:12, 188:10-24.) Dr. Goldstein testified that a Haldol injection "lasts for about 30 days or so." (Tr. at 185:14 - 186:6.) Furthermore, Haldol "neutralizes or blocks" the "psychiatric symptoms from taking cocaine." (Tr. at 194:20 - 195:6.)

Dr. Goldstein explained that Scott was mostly compliant with his Haldol treatment from 2000-2002. (*Id.*) Scott testified that he had received his monthly shot of Haldol about two weeks before the December 16, 2000 shooting. (Tr. at 43:15 - 44:7.) Petitioner's medical records show that he received his next Haldol injection on December 27, 2000, about one month after his last Haldol injection. (Tr. at 201:7-9.) Dr.

4

Goldstein further testified that Scott's post-shooting hospital records do not indicate any signs of schizophrenia. (197:9 - 198:1.) Instead, the records showed that Scott was calm, lucid, and able to give a detailed account of the shooting. (*Id.*) According to Dr. Goldstein, someone experiencing schizophrenic symptoms would have trouble making sense and may be catatonic or agitated and violent. (Tr. at 181:11 - 182:6.)

    b. Scott's Recantation

Five years after the trial, Scott recanted his trial testimony and prior statements to the police, identifying petitioner as his assailant. He claimed that, at the time of the shooting, he had missed his latest Haldol injection, and that the combination of his drug use and schizophrenia on that day had made it impossible for him to comprehend the events that had occured. (M. Scott Aff. at ¶ 4-5, 8.) He also claimed to have no memory of the person who shot him. (M. Scott Aff. at ¶ 6-7.)

    c. Procedural History

        1. The Admissibility of Prior Bad Acts under *Molineux*

On September 3, 2002, the trial court held an evidentiary hearing regarding the admissibility of petitioner's uncharged crimes. Specifically, the prosecution sought to introduce testimony that: (1) petitioner and Scott were arrested together on December 2, 2000; (2) petitioner later asked Scott to take responsibility for that crime; and (3) Scott refused. (Resp't Ex. G at 15:23 - 17:17.) The prosecution argued that this evidence established petitioner's motive for shooting Scott. (*Id.*) The court ruled that it would "allow [the prosecution] to go into that [petitioner and Scott] were both arrested, not for what, but they were both arrested and the defendant wanted the victim to take the rap

. . . [a]nd the victim refused." (Resp't Ex. G at 21:11-17.)

Additionally, the prosecution wanted to introduce testimony that petitioner gave Scott drugs on the trip to New York to complete the narrative of what occurred:

> [Petitioner] is bringing the victim [to New York], supplying him with drugs, and then taking him to a remote area in East New York where he tries to kill him. This is the whole theory of why the defendant is doing it. It goes to show all the things that the defendant did in order to try to get rid of this victim. . . . [H]e supplied the drugs to the victim as an enticement to get the witness up there, it is part of the narrative. It is a crutial [sic] part of why the victim went with him in the first place.

(Resp't Ex. G at 22:8 - 23:3.) The court ruled that, under *People v. Molinuex*, 168 N.Y. 264 (1901), this evidence is admissible. (Resp't Ex. G at 20:23-24, 26:24 - 27:17, 28:1-2.)

### 2. Appellate History

On direct appeal to the New York State Supreme Court, Appellate Division, Second Department, petitioner only raised state-law claims, contending that: (1) the conviction was against the weight of the evidence; (2) the trial court erred in admitting evidence of his prior crimes; (3) the trial court erred in allowing Scott to testify that petitioner supplied him with drugs; and (4) the trial court contravened its own ruling by permitting the prosecution to elicit testimony regarding the underlying facts of the December 2, 2000 arrest. (Resp't Ex. K.) The Second Department denied these claims on the merits and affirmed the judgment, *People v. Johnson*, 11 A.D.3d 712 (2d Dep't 2004), and the New York State Court of Appeals denied petitioner's application for leave to appeal, *People v. Johnson*, 4 N.Y.3d 745 (N.Y. 2004).

### 3. Motion under § 440.10 of the New York Criminal Procedure Law

On June 22, 2005, petitioner filed a motion in Kings County Supreme Court to

vacate the judgment pursuant to § 440.10 of the New York Criminal Procedure Law. He alleged that his counsel was ineffective under both the state and federal constitutions because he failed to inform or advise him about a plea offer. (Resp't Ex. Q.) He had not raised these arguments on direct appeal. The court denied the motion without a hearing because it found that his factual allegations were unsupported. (Resp't Ex. T.) On March 27, 2006, the Second Department, Appellate Division, denied petitioner's application for leave to appeal the denial of his § 440.10 motion. (Resp't Ex. W.) He then filed this petition on September 19, 2006.

II. Discussion

    a. Legal Standards

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs the review of petitions challenging state convictions entered after 1996, federal courts may grant habeas relief only if the state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An

7

"unreasonable application" is one in which "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"A district court must dismiss any petition for habeas corpus, brought pursuant to 28 U.S.C. § 2254, that contains issues not exhausted in the state courts." *McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002). When a petitioner presents the district court with a "mixed petition," including both exhausted and unexhausted issues, the court can offer the petitioner "the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims." *McKethan*, 292 F.3d at 122 (citation omitted). "Alternatively, a district court may also dismiss the petition with a judgment on the merits." *Id.* (citation omitted); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). State remedies are deemed exhausted when a petitioner has:

> (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim. Moreover, even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.

*McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002) (citations and internal quotation marks omitted).

District courts cannot review a state prisoner's federal claims that are barred by an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a state court's holding contains a plain statement that a claim is procedurally barred based on a state rule, the federal court may not review it even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n.10 (1989); *accord Fama v. Comm. of Corr. Servs.*, 235 F.3d 804, 811 n.4 (2d Cir. 2000) ("[W]e have held that where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."). On the other hand, if the state court holds that a claim is either unpreserved for appellate review or without merit, the claim is deemed preserved and therefore subject to habeas review. *Fama*, 235 F.3d at 810-811.

    b. Verdict Against the Weight of the Evidence

A petitioner cannot bring a habeas claim in federal court alleging that he is in

state custody in violation of state law. *See* 28 U.S.C. § 2254(a). Thus, a claim that a verdict is against the weight of the evidence has no cognizable basis for federal habeas review because it rests solely on New York Criminal Procedure Rule § 470.15[5]. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

      c. Ineffective Assistance of Trial Counsel

Petitioner contends that his counsel rendered ineffective assistance by: (1) failing to inform him of a plea offer; (2) failing to explain the merits of the plea offer; and (3) failing to inform him of the maximum prison sentence he might have faced at trial. (Pet. at 4.) The trial court denied this claim on the merits, and therefore, the claim is subject to habeas review.

*Strickland v. Washington* sets forth the standard for ineffective assistance of counsel. 466 U.S. 668, 687 (1984). To prevail under *Strickland*, a petitioner must show that his counsel's representation "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 689. The *Strickland* Court defined a "reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The trial court rejected petitioner's claims for ineffective assistance of counsel on factual grounds, finding that petitioner's counsel informed and advised him about the

plea offer prior to trial. When reviewing such determinations, "[i]f the state record is ambiguous such that two different views of the facts find fair support in the record," the court must defer to the state court's fact-finding unless petitioner provides clear and convincing evidence to the contrary. *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (citations omitted); s*ee* 28 U.S.C. § 2254(e)(1). The only evidence petitioner has offered is his own affidavit, as well as the affidavits of his mother and wife, all claiming that petitioner's counsel did not mention the plea offer until after the jury deliberations began. (Pet'rs Exs. L, M, & N.)

Petitioner's evidence is neither clear nor convincing. Petitioner's wife and mother did not have first-hand knowledge of what counsel may have told him outside of their presence. Additionally, the trial court reviewed evidence demonstrating that petitioner knew of the plea offer prior to jury deliberations. (L. Johnson Aff. at ¶ 8; D. Johnson Aff. at ¶ 7; Mem. of Law in Support of Pet. at 15.). The court records show that the prosecution announced its plea offer in open court and in petitioner's presence during pre-trial proceedings on April 29, 2002 and on June 17, 2002. (Resp't Ex. A; Resp't Ex. D.)[1] At the April 29, 2002 proceeding, the parties informed the court that the prosecution had "offer[ed] three years to defendant . . . [and] defendant has refused

---

[1] The trial court rejected petitioner's claim that he was not present at these proceedings. It explained that, according to its standard procedures at the time, had petitioner been absent, the record would have reflected that absence, and the court would have issued a warrant for his arrest. (*See* Resp't Ex. T at 7-9.) It also explained that there is "no requirement that a defendant's appearance at a scheduled court proceeding be noted on the record." (Resp't Ex. T at 9.) The record does not mention petitioner's absence and the court did not issue an arrest warrant. Additionally, at the time of the trial, the state-court clerks noted the appearances of both defendant and his

11

that." (Resp't Ex. A at 2:13-15.) These records significantly undermine the credibility of petitioner's claims and the affidavits that he relies on. On habeas review, such dubious affidavits are insufficient to overturn a factual finding of the state court.

The court also considered evidence from petitioner's trial counsel. Although he did not have a specific recollection of petitioner's case, he explained that he had been trying cases for over 40 years, and "when[ever he] get[s] a plea offer from the prosecution, the first thing [he does] is relay it to the client." (G. Sheinberg Aff. at ¶ 3.) Consistent with his usual practice, he explained that "[he is] sure that if [he had] received a plea offer from the Kings County District Attorney's Office . . . [he would have] relayed it to defendant and discussed with him whether or not to accept it." (*Id.*) In light of this evidence, the court has no basis to overturn the trial court's factual finding that petitioner's counsel discussed the plea with him. *See Crisci v. United States* 108 F. App'x 25, 27 (2d Cir. 2004).[2] Therefore, petitioner's claim for ineffective assistance of counsel fails because he has not shown, by clear and convincing evidence, that the trial court's factual findings were incorrect.

d. Due Process Claim: Evidence of Petitioner's Uncharged Crimes

Petitioner claims that the trial court erroneously admitted evidence that: (1) he supplied Scott with crack cocaine during the December 15, 2000 drive from North

---

defense counsel on the jacket of the court file. (Resp't. Ex. T at 9.)

[2] In *Crisci*, the Second Circuit affirmed the district court's finding that an attorney's affirmation that his "usual practice to discuss [sentence] calculations with every client" had greater weight than a petitioner's self-serving allegation that such a discussion never took place. 108 F. App'x at 27; *cf. Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003) ("[I]n most circumstances a convicted felon's self-serving testimony is not likely

12

Carolina to New York;[3] and (2) his December 2, 2000 arrest was for drug-related activities. (Mem. of Law in Support of Pet. at 2, 22-23.) According to petitioner, these evidentiary errors violated his due process rights. Petitioner acknowledges that this claim is procedurally barred as he did not raise it in his state proceedings. He has not alleged cause and prejudice for the default, but instead argues that the court should excuse his default and consider his due process claim because he is actually innocent. This claim of actual innocence rests entirely on Scott's recantation, in which he claims that he falsely identified petitioner as his assailant, and his "perception of the events of December 16, 2000 should not be trusted because [he] failed to take [his] medication and was high on crack cocaine." (M. Scott Aff. at ¶ 8.)

It is well established that courts must view recantations with the "utmost suspicion," *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) (quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003)), and here, Scott's recantation is suspicious for several reasons. First, neither Scott nor petitioner has explained why Scott waited approximately five years to recant his trial testimony. Second, Scott's affidavit does not

---

to be credible.").

[3] Petitioner also alleges that the trial court "ignored" its own decision to exclude the testimony about the December 15, 2000 drive. (Mem. of Law in Support of Pet. at 5 ("The trial court ruled that the People could not present evidence of petitioner's uncharged crimes—a ruling which was later ignored.").) This mischaracterizes the record. The court's initial decision to exclude this evidence was conditional—it explicitly told the prosecution that "[b]etween now and when you open, if you got a case for me on point, I would change my mind." (Resp't Ex. G at 23:14-16.) In response, the prosecution immediately cited to *People v. Till*, 87 N.Y.2d 835, 837 (1995), and offered it to the court as "a case on point." (Resp't Ex. G at 23:18 - 24:10.) The court then explained: "I have to make a decision . . . [l]et me think about it," (Resp't Ex. G at 24:11, 14), and, after a brief recess, the court ruled that the prosecution could introduce

13

explain why he allegedly lied at the trial and identified petitioner as his assailant.

Third, contrary to the recantation, the trial evidence shows that Scott was not suffering from schizophrenic symptoms at the time of the shooting: Scott testified that he had visited his psychiatrist and received his monthly Haldol injection about two weeks before the shooting and "[e]verything was okay." (Tr. at 26:9 - 16, 43:20 - 24; *compare with* M. Scott Aff. at ¶ 4.) Scott also testified that he was not suffering from any symptoms at the time of the shooting. (Tr. at 44:4 - 7.) Scott's hospital records from December 16, 2000, the day he was shot, to December 19, 2000, corroborate this testimony—"[t]here was no evidence . . . that [Scott] was displaying any signs of schizophrenia." (Tr. at 197:9-19.) With respect to Scott's drug use on December 16, 2000, the medical expert testified that Scott's Haldol injection would have "neutralize[d] or block[ed]" the psychiatric symptoms from cocaine use. (Tr. at 194:24 - 195:6.)

Furthermore, the detail and accuracy of Scott's testimony about the events of December 15 and 16, 2000, further demonstrate that he was able to perceive the events around him and did not commit perjury when he testified. *Cf. Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003) (holding that the court must decide whether the trial testimony was perjured in light of the entire record, including but not limited to the recantation). For example, Scott testified that: (1) they took Interstate 95 from North Carolina to New York, (Tr. at 31:2 - 3); (2) their trip, with stops, lasted approximately nine-and-a-half hours (Tr. at 32:23 - 33:4.); (3) Moody and petitioner took turns driving,

---

this evidence (Resp't Ex. G at 27:17.).

(Tr. at 32:17); (4) the car they rode in was "beige looking[,] brownish gold," (Tr. at 32:21 - 22); (5) their first stop in New York was a home in Brooklyn (Tr. 43:10 - 14); and (6) he was shot near an elevated train (Tr. 35:7 - 11). According to Google and Yahoo Maps, I-95 is the preferred route from the area where Scott, petitioner, and Moody lived in North Carolina to New York, and the drive, *without stops*, can take about seven hours and 15 minutes. Moody confirmed that he drove part of the way to New York, (Tr. at 201:1 - 7), and their first stop in New York was the home of petitioner's friend (Tr. at 211:24 - 25). Officer Hart confirmed that Scott was shot near the elevated L train near Van Sinderen Avenue. (Tr. at 122:23 - 123:3.) Scott's detailed and accurate testimony belies the claim in his recantation that his schizophrenic delusions and drug use rendered him unable to accurately perceive the events of December 16, 2000.

However, it is unnecessary to decide petitioner's claim of actual innocence because the underlying due process claim lacks merit.[4] Specifically, the claim fails because the evidence at issue was admissible, and even if it was not, the risk of unfair prejudice did not substantially outweigh its probative value.

---

[4] While petitioner did not raise this issue, the court notes that, in *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir. 1988), and *Sanders v. Sullivan*, 900 F.2d 601, 605 (2d Cir. 1990), which were both decided before the passage of ADEPA, the Second Circuit held that, even absent prosecutorial knowledge of perjury at the time of trial, a due process violation occurs when a state leaves a conviction in place after a credible recantation of material testimony. Other circuits have rejected this position both prior to and after the passage of ADEPA, holding that there is no due process violation unless the prosecution had knowledge of the perjury at the time of the trial. *See, e.g., Carter v. Johnson,* 131 F.3d 452, 458 (5th Cir. 1997); *Reddick v. Haws,* 120 F.3d 714, 718 (7th Cir.1997); *Jacobs v. Singletary,* 952 F.2d 1282, 1287 n.3 (11th Cir. 1992). The Supreme Court has not resolved this conflict. Thus, under ADEPA, petitioner cannot rely on the *Sanders* decisions as grounds for habeas relief. *See Penick v. Filion*, 144 F. Supp. 2d

15

1. The Trial Court Properly Admitted the Evidence of Uncharged Crimes.

Under New York law, evidence of uncharged crimes is admissible to: (1) establish motive; (2) show how the perpetrator committed the crime; and (3) provide the jury with the complete story of the charged crime by demonstrating the context of certain events relevant to the charged offense. *See People v. Till*, 87 N.Y.2d 835, 837 (1995); *People v. Ventimiglia*, 52 N.Y.2d 350, 359 (1981); *Sierra v. Burge*, 06-CV-14432 (DC), 2007 WL 4218926, *6 (S.D.N.Y. Nov. 30, 2007). Federal courts follow a similar rule. *See* Fed. R. Evid. 404(b) (evidence of other "crimes, wrongs, or acts" are admissible as proof of "motive, opportunity, intent, preparation, [and] plan"); *see also United States v. Al-Moayad*, 545 F.3d 139, 161 n.19 (2d Cir. 2008) (citation omitted) ("[T]he prosecution may admit evidence not just to fill gaps in the specific narrative of how the defendant committed the crime, but also to illustrate the greater context in which the defendant committed the crime."); *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (citation and internal quotation marks omitted) ("[E]vidence that does not directly establish an element of the offense charged [is admissible] in order to provide background for the events involved in the case.").[5] The evidence at issue falls squarely into these categories.

The testimony that petitioner prepared and supplied Scott with crack cocaine on

---

145, 152 (E.D.N.Y. 2000).
[5] The admissibility of this evidence under the federal rules indicates that the trial court's decision to admit the evidence did not violate petitioner's due process rights. *Jones v. Phillips*, No. 03-CV-2115 (ENV), 2008 WL 4146197, at *5 (E.D.N.Y. Sept. 8, 2008) (citations omitted).

16

December 2, 2000 illustrates the severity of the crime for which petitioner wanted Scott to take responsibility. Such evidence assists the jury in evaluating the strength of petitioner's motive for shooting Scott. Additionally, petitioner's prior relationship as Scott's drug supplier shows how petitioner committed the crime. Petitioner knew about Scott's addiction to crack cocaine and, as Scott's supplier, was in a position to exploit that vulnerability. On December 15 and 16, 2000, petitioner took advantage of this addiction by using crack cocaine to entice and tranquilize Scott, prompting him to go to Brooklyn without resistance. (Tr. at 21:19 - 22:6.) When they arrived in Brooklyn, petitioner continued to give Scott crack cocaine and then led Scott to a remote location where he shot him. In sum, the evidence at issue illustrated motive, preparation, and plan, and provided essential background information for the jury to understand the context of the crime. As such, it was admissible.

2. The Risk of Unfair Prejudice Did Not Significantly Outweigh the Probative Value.

Even if the trial court had admitted the evidence in error, the error would not entitle petitioner to habeas relief. The "[a]dmission of other crimes evidence provides a ground for federal habeas relief only if the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial." *Bronshtein v. Horn*, 404 F.3d 700, 730 (3d Cir. 2005) (citation and internal quotation marks omitted); *see also Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) ("Where the prejudicial evidence is probative of [an] essential element in the case, its admission does not violate the defendant's right to due

17

process.") (internal quotation marks omitted); *Perez v. Miller*, 05-CV-5575 (NG), 2009 WL 1044629, at *12 (E.D.N.Y. Apr. 20, 2009) (citations omitted) ("For the writ to issue . . . the improperly admitted evidence's prejudicial impact must outweigh its probative value.").

That is not the case here. The evidence at issue was the only evidence establishing the full extent of petitioner's motive for and method of perpetrating the crime. As such, the risk of unfair prejudice does not substantially outweigh the probative value of the evidence. *See Sierra v. Burge*, 06-CV-14432(DC), 2007 WL 4218926, at *6 (S.D.N.Y. Nov. 30, 2007) (holding that the probative effect of prior bad acts that were relevant to explain the chain of events that led to and motivated the petitioner's assault outweighed any harm or prejudicial effect); *Sutton v. Herbert*, 38 F. Supp. 2d 335, 339 n.3 (S.D.N.Y. 1999) (citing and quoting *Watkins v. Meloy*, 95 F.3d 4, 7 (7th Cir. 1996) ("If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded . . . .")).

In sum, the trial court properly admitted the evidence of petitioner's drug activities as proof of why and how petitioner committed the crime. Furthermore, the risk of unfair prejudice from the admission of the evidence does not substantially outweigh its probative value. Accordingly, the court finds that the admission of the evidence does not provide a basis for habeas relief.

II. Conclusion

For the reasons set forth above, Johnson's petition for a writ of habeas corpus is denied. Petitioner is further denied a certificate of appealability as petitioner failed to

make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* FED. R. APP. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

DATED: Brooklyn, New York
September 28, 2009

                    _____/s/_____
                     DORA L. IRIZARRY
                    United States District Judge